George T. DAGGETT, Plaintiff,

v.

Irwin I. KIMMELMAN, etc., et al., Defendants.

Edwin B. FORSYTHE, et al., Plaintiffs,

v.

Thomas H. KEAN, etc., et al., Defendants.

Civ. A. Nos. 82–297, 82–388.

United States District Court, D. New Jersey.

March 3, 1982.

As Amended March 11, 1982.

Probable Jurisdiction Noted June 21, 1982. See 102 S.Ct. 2955.

Gibbons, Circuit Judge, dissented and filed opinion.

George T. Daggett, pro se.

Hellring, Lindeman, Goldstein & Siegal by Bernard Hellring, Jonathan L. Goldstein, John Sheridan, Robert S. Raymar, Stephen L. Dreyfuss, Newark, N. J., for plaintiffs Forsythe, et al.

Michael R. Cole, Asst. Atty. Gen., Trenton, N. J., for defendants (82–297 and 82–388).

Greenstone & Sokol by Leon J. Sokol, Hackensack, N. J., for defendant-intervenor Orechio.

Marinari & Farkas, P. C. by Lawrence T. Marinari, Trenton, N. J., for defendant-intervenor Karcher.

Sills, Beck, Cummis, Zuckerman, Radin & Tischman, P. A. by Clive S. Cummis, Charles J. Walsh, Jerald D. Baranoff, Angelo J. Genova, Kenneth J. Guido, Newark, N. J., for defendants-intervenors Florio, et al.

Joseph F. Shanahan, Lambertville, N. J., and Ralph Fucetola, III, North Arlington, N. J., for proposed plaintiffs-intervenors Magee, et al.

Frank Askin, Newark, N. J., proposed defendant-intervenor pro se.

Before GIBBONS, Circuit Judge, FISHER, Chief District Judge, and BROTMAN, District Judge.

## OPINION

CLARKSON S. FISHER, Chief District Judge.

These consolidated cases bring under attack the constitutionality of P.L. 1982, c. 1,

which creates districts for the election of United States representatives from New Jersey. Plaintiffs are concerned citizens, representatives of interested groups, incumbent Republican members of Congress, and other individuals with various interests. The defendants are the Governor, Attorney General and Secretary of State of New Jersey.

We have permitted the incumbent Democratic members of Congress and other concerned persons to intervene as defendants. We have reserved decision on the motions to intervene of still others. Because of the decision here, their status will remain unchanged.

This three-judge court was convened pursuant to 28 U.S.C. § 2284(a). The relief sought includes a declaration that P.L. 1982, c. 1 is unconstitutional and an injunction against the state officers to prevent them from implementing the Act by proceeding with the primary election insofar as it relates to candidates for the House of Representatives.

At a hearing on February 19, 1982, the court directed the parties to take depositions, summarize the testimony, file affidavits and submit exhibits for final hearing on February 26, 1982. Between these dates, all parties moved for summary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure.

At final hearing, the parties agreed that if the motions for summary judgment were denied, they would have no further proofs to advance other than what then comprised the record. Because we prefer to decide the matter on the application for injunctive relief on the entire record, rather than by summary judgment, those motions are denied. The application for a preliminary injunction is consolidated with plaintiff's demand for a permanent injunction into a final hearing pursuant to Fed.R.Civ.P. 65(a). Counterclaims advanced on behalf of some of the parties are dismissed, either because this disposition of the case renders them moot, or because they do not constitute a cause of action.

The 1980 decennial census recorded a population of 7,364,826 for the State of New Jersey. Heretofore, New Jersey had 15 congressional districts constituted by this court in *David v. Cahill*, 342 F.Supp. 463 (D.N.J.1972). Pursuant to the requirements of 2 U.S.C. § 2a(b), the Clerk of the United States House of Representatives has notified the Governor of the State of New Jersey that, on the basis of the 1980 decennial census, the number of representatives to which the state is entitled has been decreased from fifteen to fourteen. This notification has rendered the present apportionment of congressional districts unconstitutional.

After this notification, it became the duty of the New Jersey legislature to reapportion the fourteen congressional districts in conformity with the mandate of art. I, § 2 of the United States Constitution and the standards of *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and the cases that followed. On the day he left office, former Governor Brendan T. Byrne signed a bill sponsored jointly by Senator Matthew Feldman and Assemblyman Byron M. Baer which then became P.L.1982, c. 1. See Appendix A for Senate Bill 711, which became P.L.1982, c. 1, and a map of the districts as drawn by the Act. This litigation followed.

The facts are clear and, in a general sense, not really disputed. They emerge from the exhibits, the affidavits, and especially from the testimony of Assemblyman Christopher Jackman, Speaker of the 199th Assembly and Speaker *pro tem* of the 200th; Senator Matthew Feldman, President *pro tem* of the Senate; Assemblyman Alan J. Karcher, Speaker of the 200th Assembly; and Assemblyman Richard Zimmer.

The story really begins on August 7, 1981, when Ernest C. Reock, Jr., sent a "model" redistricting proposal to the leadership of the legislature and the Governor. On August 11, 1981, Reock sent the plan to all the members of the legislature. Mr. Reock was, and is, a research professor at Rutgers University since 1950 and Director of the

Bureau of Government Research at Rutgers University since 1960. The Bureau of Government Research has three principal functions: to conduct research on problems of state and local government in New Jersey, to develop and to conduct training programs for local government officials in New Jersey, and to provide technical assistance to state agencies and officers, as well as to those members of the public interested in the problems of government.

This plan or proposal,- as amended, set forth fourteen congressional districts with an overall absolute range of deviation of 1,556 people and the overall relative range of 0.296%. By contrast, P.L.1982, c. 1, the present law, has an overall absolute range of deviation of 3,674 people and an overall relative range of deviation of 0.6984%.

The Reock proposal prompted a remarkable reply from then Speaker of the Assembly Jackman. The letter is set forth in its entirety as Appendix B. This letter informed Professor Reock that redistricting was the business of the legislature and that the partisan majority had an interest in redistricting and would not subjugate its concerns. He added that Professor Reock's plan had no chance of adoption.

There ensued thereafter a series of meetings between Democratic legislators, congressmen, and other interested persons to discuss the form and content of a redistricting bill. There were also contacts made with some Republican office-holders. Obviously, staff people were at work to develop a plan.

When the 200th legislature convened, a number of redistricting bills were introduced until at last P.L.1982, c. 1 was passed and signed by the Governor.

The deposition testimony indicates that the Democratic leadership was concerned with certain criteria. Assembly Speaker Karcher was interested in minimum deviations. In fact, he stated he was not interested in any bill with a deviation in excess of one percent. His further aims were to protect minority interests, the preservation of cores of pre-existing districts and the preservation of municipal boundary lines.

He further indicated that he was interested in preserving the influence in Congress of certain senior Democratic incumbents.

Senator Feldman, who sponsored the bill, indicated that he desired numerical equality as near to zero as possible. As additional priorities, he emphasized the importance of protection of black voters and a desire to keep counties, especially Bergen County, intact as far as possible.

Every congressional redistricting plan must be measured against the requirement of art. I, § 2: "The House of Representatives shall be composed of Members chosen ... by the People of the several States ...." In *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court held that "the command of Art. I, § 2 ... means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7–8, 84 S.Ct. at 529–530 (footnote omitted).

The "as nearly as is practicable" standard was discussed in *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519. In that case, the Court struck down a Missouri redistricting plan which contained a 5.97% total deviation. Missouri's primary argument was that the population variances were so small that they should be considered *de minimus.* The Court, however, ruled otherwise.

> We reject ... [the] argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimus* and to satisfy without question the "as nearly as practicable" standard .... [Rather], the ... standard requires that the State make a good faith effort to achieve precise mathematical equality.... Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.

394 U.S. at 530–31, 89 S.Ct. at 1228–29 (citation omitted). See also *Wells v. Rockefeller*, 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969).

In *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), the Court declared a Texas plan with a total deviation of 4.13% unconstitutional. After failing to demonstrate that the population variances were unavoidable or justified, the State argued that *Kirkpatrick* and *Wells* should be modified to permit small population variances among congressional districts without requiring the State to justify them. However, the Court ruled that it was "not inclined to disturb *Kirkpatrick* and *Wells*." 412 U.S. at 793, 93 S.Ct. at 2353.

Finally, in *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), the Court held that minor population deviations in state legislative districts do not establish a *prima facie* constitutional violation, "[a]s contrasted with congressional districting, where population equality appears now to be the pre-eminent, if not the sole, criterion on which to adjudge the constitutionality, . . . ." 420 U.S. at 23 (citations omitted).

■ P.L. 1982, c.1 can withstand constitutional attack only if the population variances "are unavoidable despite a good-faith effort to achieve absolute equality, or . . . [if] justification is shown." *Kirkpatrick*, 394 U.S. at 531, 89 S.Ct. at 1229. It is clear that the .6984% population deviation of P.L. 1982, c.1 is not unavoidable. The legislature had the option of choosing from several other plans with a lower total deviation than .6984%. For example, the Reock plan contained a total deviation of .3250%, and only .2960% after it was amended. The DiFrancesco plan, S–3547, introduced on January 4, 1982, had a total deviation of .1253%. The Hardwick plan, A–3817, introduced on January 12, 1982, contained a total deviation of .4515%. The Bennett plan, A–614, and the Kavanaugh plan, A–615, although introduced one day after P.L. 1982, c.1 was signed into law, contain total deviations of .1369% and .0293%, respectively.

In devising a redistricting plan, the Assembly leadership was concerned with drawing districts of equal population. However, this constitutional requirement was viewed as merely aspirational, with appropriate recognition to be given to such factors as the preservation of cores of pre-existing districts, the preservation of municipal boundary lines, and the preservation of the districts of incumbent Democratic Congressmen. Likewise, the Reock plan was rejected because it did not reflect the leadership's partisan concerns. Furthermore, the sponsor of P.L. 1982, c.1 stated on the floor of the Assembly that there cannot be a plan of precise population equality and that it was necessary to balance that factor against other criteria.

The Senate leadership viewed the issue in similar terms. While acknowledging that plans with lower total deviations than P.L. 1982, c.1 existed, the leadership believed that population equality was not the only standard.

■ Defendant-intervenors contend nevertheless that the population deviations in P.L. 1982, c.1 are justified by the legislature's goal of avoiding the dilution of minority voting strength. The plan makes a conscious effort, defendants argue, to preserve the Tenth District with a configuration and racial composition that makes it probable that a person chosen by black voters will be elected in that district. We need not decide whether this interest is sufficient to justify a deviation from population equality. First, defendant-intervenors have not attempted to demonstrate, nor can they demonstrate, any causal relationship between the goal of preserving minority voting strength in the Tenth District and the population variances in the other districts. The Fourth District contains the greatest variance in excess of the "ideal" district: 1,413 people, or .2666%. The Sixth District contains the greatest variance below the ideal district: 2261 people, or .4298%. We find that the goal of preserving minority voting strength in the Tenth District is not related in any way to the population deviations in the Fourth and Sixth Districts.

■ Secondly, it is difficult to reconcile the goal of preserving minority voting strength with P.L. 1982, c.1's treatment of the City of Orange. Orange, a city with a

high concentration of minority groups, is placed not in the Tenth District, but in the Eleventh. Defendant-intervenors argue that Orange was left out of the Tenth District so that Irvington and Hillside, towns with an alleged substantial immigration of black residents, could be included. However, projected population shifts may be considered in drawing a redistricting plan only when "these shifts can be predicted with a high degree of accuracy, . . . ." *Kirkpatrick*, 394 U.S. at 535, 89 S.Ct. at 1231. Furthermore, "[f]indings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an *ad hoc*, manner." *Id.* Defendant-intervenors, having failed to document these expected population shifts, fall far short of this standard.

Defendant-intervenors argue that the "as nearly as practicable" standard is satisfied when the population variation is less than the statistical imprecision of the census. Under this reasoning, defendant-intervenors conclude that the .6984% total deviation of P.L. 1982, c.1 is insignificant and should be considered the functional equivalent of mathematical equality. We reject such an approach. Whatever margin of error was present in the 1980 decennial census, there were similar limitations in the 1960 and 1970 decennial censuses when *Kirkpatrick* and *White* were decided. Despite this factor, the Court could not have spoken more clearly. "We reject . . . [the] argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimus* and to satisfy without question the 'as nearly as practicable' standard." *Kirkpatrick*, 394 U.S. at 530, 89 S.Ct. at 1228.

We conclude that P.L. 1982, c.1 does not comply with the mandate of art. I, § 2 and the standards of *Kirkpatrick* and *White*. Judgment will be entered declaring P.L. 1982, c.1 unconstitutional and enjoining the defendant state officers from conducting primary or general congressional elections

under its terms. The legislature will have until March 22, 1982 to enact a new constitutional plan for reapportionment. If one is not forthcoming, this court will convene on March 26, 1982 to undertake further proceedings.

GIBBONS, Circuit Judge, dissenting.

I join fully in the court's findings of fact and in the rulings on motions. In particular, I agree that the only effort made by the Democratic legislative leadership to comply with *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) was Mr. Karcher's instruction that no plan would be considered which had a population deviation greater than one per cent, and that the minorities' concentration justification for the deviations which were produced must on this record be rejected as pretextual. Moreover I concede that the majority's conclusion of law, that P.L. 1982, c.1 is unconstitutional, is a quite plausible interpretation of the relevant Supreme Court authorities.[1] Nevertheless, I dissent.

I recognize that in *Kirkpatrick v. Preisler, supra,* the court *said* that it rejected the argument that there is a fixed numerical or percentage population variance small enough to be considered *de minimus.* In the same paragraph, however, the Court acknowledged that some population variances could be justified. Since, literally, it would be possible to achieve equal number districts, plus or minus one, by disregarding municipal or even census tract lines, the Court must have meant that some considerations other than numerical equality could be relied upon in justification for such variances. Moreover there is no suggestion in the governing cases that even blunt political considerations such as motivated the New Jersey legislative majority are not legitimate considerations.

We must keep in mind that while for congressional redistricting the basic rule,

---

1. *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller*, 394 U.S. 542, 89

S.Ct. 1234, 22 L.Ed.2d 535 (1969). *See, Chapman v. Meier*, 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975).

derived from Article 1, Section 2 of the Constitution, is districts of equal population, the purpose of that rule is to prevent the phenomenon of voters in smaller congressional districts having voting power disproportionate to the voting power of voters in larger districts. The rule requiring apportionment into districts of equal population is itself only an imprecise means to that end, for it is applied not to actual population in each district from time to time, but to population as determined in the decennial census. In any election the population of each district may vary from the ideal. During the course of ten years the variance might be quite large, but the districts determined on the basis of census equality still would be valid. We know, moreover, that the census, while it is amazingly accurate, does not achieve one hundred percent accuracy. It has been estimated that for the 1970 census the margin of error resulting from undercounting may have been as much as 2.5% nationally and 2.6% in New Jersey. *See,* Bureau of the Census, Current Population Reports, Special Studies, Coverage of Population in the 1970 Census and Some Implications for Public Programs (August 1975).

We are not dealing with an equal protection problem, for we know from the cases dealing with apportionment for state legislatures and local governmental units that deviations in excess of those in P.L. 1982, c.1 are tolerable. *E.g., Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). Thus the *Kirkpatrick v. Preisler* rule is one implied from the clause in Article I of the constitution apportioning representation in the House of Representatives in accordance with the constitutionally mandated decennial census. The basic purpose of that clause is to prevent disparities in representation among the states. Even for that purpose the constitutionally mandated decennial census measurement is imprecise. It is no less so when the same measurement is used for districting within a state.

It is conceivable that the Court would hold that only such imprecision as is built into the constitutional standard is tolerable, and no more. The Court has not done so. Instead it has suggested that some justification for variances may be advanced. It seems to me, therefore, that the rule must be that variances may be justified which do not achieve statistically significant dilutions of the relative representation of voters in larger districts when compared with that of voters in smaller districts. I would read the *de minimus* language in *Kirkpatrick v. Preisler* as a prohibition against toleration of *de minimus* dilutions of relative representation rather than as a prohibition against toleration of *de minimus* population variances which have no statistically relevant effect on relative representation. A plus-minus deviation of 0.6984% falls within the latter category.

The apportionment map produced by P.L. 1982, c.1 leaves me, as a citizen of New Jersey, disturbed. It creates several districts which are anything but compact, and at least one district which is contiguous only for yachtsmen. While municipal boundaries have been maintained, there has been little effort to create districts having a community of interests. In some districts, for example, different television and radio stations, different newspapers, and different transportation systems serve the northern and southern localities. Moreover the harshly partisan tone of Speaker Christopher Jackman's letter to Ernest C. Reock, Jr. is disedifying, to say the least. It is plain, as well, that partisanship produced artificial bulges or appendages of two districts so as to place the residences of Congressmen Smith and Courter in districts where they would be running against incumbents. But none of my concerns as a citizen are relevant to the standard which I must apply as a judge. Indeed the same partisan ends could have been achieved by tinkering with census tracts rather than whole municipalities thereby reducing population deviations to close to zero.

This is not a case in which district lines were drawn in order to disadvantage racial

minorities or religious groups. Republican members of the House of Representatives are not, at least to date, considered to be members of a discrete and insular minority. Thus the only relevant constitutional consideration, in the absence of a much needed federal statute imposing standards for congressional districting, is the achievement of equal representation for more or less equal numbers of persons. A deviation in population between the largest and the smallest district of 0.6984% is smaller than the recognized margin of undercounting in the census. I would hold that achievement of that small a deviation demonstrates as a matter of law a good faith effort to achieve equal member districts.

## APPENDIX A

### SENATE, No. 711
### STATE OF NEW JERSEY

#### INTRODUCED JANUARY 12, 1982

#### By Senator FELDMAN

#### (Without Reference)

AN ACT creating districts for the election of members to the House of Representatives of the United States of America to serve in the 98th Congress and each subsequent Congress, and repealing sections 1 and 2 of P.L.1966, c. 156 and P.L.1981, c. 561.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1. This act shall be known and may be cited as the "Congressional District Act for the State of New Jersey (1982)."

2. For the purpose of electing members of the House of Representatives of the United States of America from the State of New Jersey to serve in the 98th Congress and each subsequent Congress, the State of New Jersey shall be divided into the following 14 single-member districts:

First. The county of Gloucester and that portion of the county of Camden embracing Audubon, Audubon Park, Barrington, Bellmawr, Berlin, Berlin township, Brooklawn, Camden, Chesilhurst, Clementon, Gibbsboro, Gloucester city, Gloucester township, Haddonfield, Haddon Heights, Hi-Nella, Laurel Springs, Lindenwold, Magnolia, Mount Ephraim, Pine Hill, Pine Valley, Runnemede, Somerdale, Stratford, Tavistock, Voorhees, Waterford, Winslow, and Woodlynne.

Second. The counties of Salem, Cumberland, Cape May, and Atlantic that portion of the county of Ocean embracing Barnegat, Barnegat Light, Beach Haven, Eagleswood, Harvey Cedars, Little Egg Harbor, Long Beach, Ocean, Ship Bottom, Stafford, Surf City, Tuckerton, and that portion of the county of Burlington embracing Bass River, Tabernacle and Washington.

Third. That portion of the county of Monmouth embracing Aberdeen, Allenhurst, Asbury Park, Atlantic Highlands, Avon, Belmar, Bradley Beach, Deal, Eatontown, Englishtown, Fair Haven, Hazlet, Highlands, Interlaken, Keansburg, Keyport, Loch Arbour, Long Branch, Manalapan, Manasquan, Matawan, Middletown, Monmouth Beach, Neptune city, Neptune township, Oceanport, Ocean, Red Bank, Sea Bright, Sea Girt, South Belmar, Spring Lake, Spring Lake Heights, Union Beach, West Long Branch, that portion of the county of Ocean embracing Bay Head, Brick, Lakewood, Mantoloking, Point Pleasant Beach, Point Pleasant, and that portion of the county of Middlesex embracing Old Bridge.

Fourth. That portion of the county of Burlington embracing Beverly, Bordentown city, Bordentown township, Burlington city, Burlington township, Chesterfield, Cinnaminson, Delanco, Delran, Edgewater Park, Florence, Mansfield, Maple Shade, Palmyra, Pemberton borough, Pemberton township, Riverside, Riverton borough, Springfield, Willingboro, Wrightstown and Fieldsboro, that portion of the county of Camden em-

bracing Merchantville and Pennsauken, that portion of the county of Mercer embracing East Windsor, Ewing, Hamilton, Hightstown, Lawrence, Trenton, Washington and West Windsor, that portion of the county of Middlesex embracing Plainsboro and that portion of the county of Monmouth embracing Allentown, Roosevelt and Upper Freehold.

Fifth. That portion of the county of Bergen embracing Allendale, Closter, Cresskill, Demarest, Harrington Park, Haworth, Ho-ho-kus, Mahwah, Midland Park, Montvale, Northvale, Old Tappan, Oradell, Park Ridge, Ramsey, Ridgewood, River Edge, River Vale, Rockleigh, Saddle River, Upper Saddle River, Waldwick and Wyckoff, that portion of the county of Hunterdon embracing Alexandria, Bethlehem, Bloomsbury, Delaware, East Amwell, Flemington, Franklin, Frenchtown, Hampton, Holland, Kingwood, Lambertville, Milford, Raritan, Stockton, Union, West Amwell and that portion of the county of Mercer embracing Hopewell, Hopewell township and Pennington, that portion of the county of Morris embracing Boonton, Boonton township, Denville, Jefferson, Mine Hill, Montville, Mount Arlington, Mount Olive, Randolph and Roxbury, that portion of the county of Passaic embracing Ringwood and West Milford, that portion of the county of Sussex embracing Branchville, Frankford, Hampton, Lafayette, Montaque, Sandyston, Stillwater, Sussex, Vernon, Walpack and Wantage and that portion of the county of Warren embracing Alpha, Belvidere, Blairstown, Franklin, Greenwich, Hackettstown, Hardwick, Harmony, Hope, Knowlton, Liberty, Lopatcong, Oxford, Pahaquarry, Phillipsburg, Pohatcong, Washington, Washington township and White.

Sixth. That portion of the county of Middlesex embracing Carteret, East Brunswick, Edison, Helmetta, Highland Park, Metuchen, Milltown, New Brunswick, Perth Amboy, Piscataway. Sayreville, South Amboy, South Plainfield, South River, Spotswood and Woodbridge and that portion of the county of Union embracing Linden, Rahway and Winfield.

Seventh. That portion of the county of Mercer embracing Princeton, Princeton township, that portion of the county of Middlesex· embracing Cranbury, Dunellen, Jamesburg, Middlesex, Monroe, North Brunswick and South Brunswick, that portion of the county of Monmouth embracing Freehold, Freehold township, Marlboro and Millstone, that portion of the county of Somerset embracing Bound Brook, Franklin, Manville, Millstone, North Plainfield, Rocky Hill and South Bound Brook and that portion of the county of Union embracing Clark, Cranford, Elizabeth, Fanwood, Garwood, Plainfield, Roselle, Roselle Park, Scotch Plains and Westfield.

Eighth. That portion of the county of Bergen embracing Franklin Lakes, Garfield, Oakland and Wallington, that portion of the county of Morris embracing Butler, Dover, Kinnelon, Lincoln Park, Pequannock, Riverdale, Rockaway, Rockaway township, Victory Gardens and Wharton and that portion of the county of Passaic embracing Bloomingdale, Clifton, Haledon, Hawthorne, North Haledon, Passaic, Paterson, Pompton Lakes, Prospect Park, Wanaque and Wayne.

Ninth. That portion of the county of Bergen embracing Alpine, Bergenfield, Bogota, Carlstadt, Cliffside Park, Dumont, East Rutherford, Edgewater, Elmwood Park, Emerson, Englewood, Englewood Cliffs, Fair Lawn, Fairview, Fort Lee, Glen Rock, Hackensack, Hasbrouck Heights, Hillsdale, Leonia, Lodi, Maywood, Moonachie, New Milford, Norwood, Paramus, Ridgefield Park, Rochelle Park, Rutherford, Saddle Brook, South Hackensack, Teaneck, Tenafly, Teterboro, Washington, Westwood, Woodcliff Lake and Wood-Ridge.

Tenth. That portion of the county of Essex embracing East Orange, Glen Ridge, Irvington, Newark and South Orange, that portion of the county of Union embracing Hillside, and that portion of the county of Hudson embracing Harrison.

Eleventh. That portion of the county of Bergen embracing North Arlington, that portion of the county of Essex embracing Belleville, Bloomfield, Caldwell, Cedar Grove, Essex Fells, Fairfield, Livingston, Lyndhurst, Maplewood, Montclair, North Caldwell, Nutley, Orange, Roseland, Verona, West Caldwell and West Orange, that portion of the county of Hudson, embracing East Newark, Kearny and Secaucus, that portion of the county of Morris embracing East Hanover, Mountain Lakes and Parsippanny-Troy Hills, and that portion of the county of Passaic embracing Little Falls, Totowa and West Paterson.

Twelfth. That portion of the county of Essex embracing Millburn, that portion of the county of Hunterdon embracing Califon, Clinton, Clinton township, Glen Gardner, High Bridge, Lebanon, Lebanon township, Readington and Tewksbury, that portion of the county of Morris embracing Chatham, Chatham township, Chester, Chester township, Florham Park, Hanover, Harding, Madison, Mendham, Mendham township, Morris Plains, Morris township, Morristown, Netcong, Passaic and Washington, that portion of the county of Somerset embracing Bedminster, Bernards, Bernardsville, Branchburg, Bridgewater, Far Hills, Green Brook, Hillsborough, Montgomery, Peapack-Gladstone, Raritan, Somerville, Warren and Watchung, that portion of the county of Sussex embracing Andover, Andover township, Byram, Franklin, Fredon, Green, Hamburg, Hardyston, Hopatcong, Newton, Ogdensburg, Sparta and Stanhope, that portion of the county of Union embracing Berkeley Heights, Kenilworth, Mountainside, New Providence, Springfield, Summit and Union township

and that portion of the county of Warren embracing Allamuchy, Frelinghuysen, Independence and Mansfield.

Thirteenth. That portion of the county of Burlington embracing Eastampton, Evesham, Hainesport, Lumberton, Medford Lakes, Medford, Moorestown, Mount Holly, Mount Laurel, New Hanover, North Hanover, Shamong, Southampton, Westhampton and Woodland, that portion of the county of Ocean embracing Beachwood, Berkeley, Dover, Island Heights, Jackson, Lacey, Lakehurst, Lavallette, Ocean Gate, Pine Beach, Plumsted, Seaside Heights, Seaside Park, South Toms River and Manchester, that portion of the county of Monmouth embracing Brielle, Colts Neck, Farmingdale, Holmdel, Howell, Little Silver, Rumson, Shrewsbury, Shrewsbury township, Tinton Falls and Wall and that portion of the county of Camden embracing Cherry Hill, Collingswood, Haddon, Lawnside and Oaklyn.

Fourteenth. That portion of the county of Bergen embracing Little Ferry, Palisades Park and Ridgefield and that portion of the county of Hudson embracing Bayonne, Guttenberg, Hoboken, Jersey City, North Bergen, Union city, Weehawken and West New York.

3. Sections 1 and 2 of P. L. 1966, c. 156 (C. 19:46-2 and 19:46-3) and P. L. 1981, c. 561 are repealed.

4. This act shall take effect immediately.

## STATEMENT

The purpose of this bill is to create 14 Congressional Districts for use beginning with the 98th Congress.

APPENDIX A

CONGRESSIONAL
DISTRICTS
1983 –

(Pursuant To P.L. 1982, C.1)

APPENDIX B

GENERAL ASSEMBLY
OF NEW JERSEY
TRENTON

SPEAKER
CHRISTOPHER J. JACKMAN
ASSEMBLYMAN, DISTRICT 33 (HUDSON)
6110 MONITOR PLACE
WEST NEW YORK, N.J. 07093

RES. 201-868-2637
BUS. 201-861-0961
LEG. OFF. 201-861-7266

August 28, 1981

Ernest C. Reock, Jr.
Director
Bureau of Government Research
Rutgers Univsersity
New Brunswick, New Jersey 08403

Dear Mr. Reock:

I recently received your letter and plan for New Jersey
Congressional districts.  I want to thank you for the time
and effort you put into your paper.  As a principle in the
process which will decide New Jersey's Congressional
boundaries for the next decade, I have taken this opportuni-
ty to respond to your report.

After reading your report I am struck by the suggestion that
adherence to the criteria in your report will produce one
and only one "fair" map.  A further suggestion that this
single map then serve as the standard against which all
other plans be measured seems to me somewhat presumptious.
In fact I am certain that no single scientifically developed
blueprint can be applied in the case of Congressional
Apportionment.  It is clear that a variety of proposed plans
and possible approaches must be explored, all of which have
merits as being fair.

Political fairness as it applies to Congressional redistrict-
ing is an illusive concept which as you know is often used as
a smokescreen for partisan political advantage.  Redistrict-
ing is a process necessarily comprised of many diverse interests
and subjective judgements.  Just as several doctors evaluating
the same patient could offer several differing but valid
opinions, so it is true that those who are directly involved
in the apportionment process would be ill advised to set out
in the preconceived notion that only one opinion or standard
should be recognized.  To call your redistricting plan "fair"
in comparison to all other plans seems little more than an
academic shell game.

In addition I am concerned that assertions about fairness and
your urging about establishing standards without recognition
of the political process may deny the very real political
nature of apportionment.  Congressional redistricting is a
matter taken up by the entire Legislature.  Legislators are
elected as members of parties.  Those legislators and their
parties represent communities of interest which bind members
together.  Political parties serve to form governing coalitions,
without which politics would be in total chaos.  The strength
of the party-system depends on many varied and quite intricate

relationships. As such, the issues inherent in apportionment have come to be defined by parties, negotiated by parties and ultimately solved by parties.

The Federal Courts have utilized very definable features in judging the comparative merits of Congressional apportionment plans. You discuss in your paper the requirements for districts that are contiguous and compact, which do not divide municipalities and adhere to county boundaries wherever possible, which recognize shifts in populations from older to new communities, and which take into account the previous districts which are being changed. You also recognize that these factors are often in competition with each other and that a sense of priority must be attached to these criteria. When two or more criteria are at odds how should decisions be made? Although we must resort to guessing at judicial intentions, it is regrettable that such decision criteria were not included in your report. While you adequately explain that your proposal does meet judicial standards you do not engage in the more technical discussion of why this plan is better than other possible plans. Statements alluding to its superiority are left unsubstantiated.

In addition to the definable and perhaps measurable criteria by which you drew your plan, apportionment is a political process. No apologies need be made for interests which exist and the pressures which bear upon those who are burdened with the decisions of apportionment. Although you are obviously quite well versed in redistricting law and history, your paper is silent on the important role of community-level politics in apportionment decisions. It is perhaps the process within which Congressional redistricting occurs which dictates its outcome. Without changing the prescribed apportionment process in New Jersey and in other states, it is unlikely that your plan has any chance of adoption. With this in mind, as I'm sure you are aware, it is difficult to understand how you expect legislative action to coincide with your views of the "fairest" plan possible. Why, indeed did you concentrate on alternatives for the solution without even mentioning the political process through which it must pass?

With this in mind, it may be useful to examine the redistricting process and the context within which the New Jersey legislative takes up the issue.

Here in New Jersey the Democratic Party has control over the Congressional apportionment process for the first time ever. This occurs, as you know, because Democrats hold a majority in both houses of the legislature, as well as being represented in the Governor's seat. Ten years ago, and during every Congressional redistricting in New Jersey's history, Republicans played the predominant role. Each time Republicans sought to legislate districts which would maximize their representation in Congress. And each time Republicans drew districts which were intended to improve upon the previous partisan Congressional representation.

Well, an interesting thing happened along the way -- as I'm sure you are aware: the Democratic Party became the dominant party in New Jersey; the party considered more representative of the needs and wishes of New Jersey voters. In the last ten

years -- under a court-ordered adaptation of a Republican plan -- Democratic Congressional candidates have overwhelmingly been the choice of the voters. In those years Democrats have never held less than 8 of the 15 Congressional districts and as many 12. Furthermore, Democratic electoral dominance over the past decade can be established by reviewing the party representation amongst the major political offices. Over the period in which the current districts have been in place, Democrats have dominated the State House at all levels, represent the bulk of the Congressional delegation, and now represent both United States Senators.

The political analysis used to justify your plan employs election results from 1979 and 1980 only. It is my estimation that in determining the best plan for Congressional districts -- districts that will be in place for the next ten years -- election results from the previous ten years should be taken into account. Of course, more recent elections may be given more weight, but not to the total exclusion of other election data. From my point of view, the 1980 election results are not entirely indicative of the state of partisan politics in New Jersey. There is no doubt that the Democratic party under the leadership of Jim Florio, our gubernatorial candidate, will continue to enjoy great success amongst the voters of New Jersey. Our representatives in Congress should, as closely as possible, parallel the sentiments of New Jersey voters.

It is in fact interesting that you make use of past election data in defining the expected partisan makeup of your plan. As I'm sure you are aware, others who have made suggestions as to the improvement of political fairness in the apportionment process, tend to shun the use of such political information, perhaps exclude it altogether. Nonetheless, since you have reviewed past election data you must surely expect all others involved in the process to do likewise. Given the process by which the Legislature decides upon a plan how can you expect members of the Legislature to ignore election data which would perhaps lead to other Congressional district configurations more beneficial to party members? You in essence are asking Democrats to subjugate their interests and in effect ignore political election results in order to accommodate your opinions on the "ideal" apportionment plan.

Congressional redistricting in New Jersey must also be viewed from the more broad-based national perspective. The Republican party is only 27 votes short of absolute control of Congress. With a shift of population and consequently Congressional seats from the traditionally Democratic urban industrial states to the more Republican dominated sun-belt states the redistricting process is viewed by Republicans as an opportunity to close that 27 vote margin, or perhaps even overcome it entirely. Toward this end the Republican National Committee (RNC) has undertaken a widely publicized and well-financed redistricting program. Their strategy, as the following examples illustrate is to maximize the Republican potential in those states where they control the process and attack the Democrats as politically unfair in those states in which the Democrats are involved.

Indiana is a state where the Republican party holds a majority in both houses of the Legislature as well as being represented in the Governor's office. A state tailor-made for the RNC strategy, they sent in a team of technical advisors and managed

a bill through the Legislature which was later signed into law by the Governor. By packing all the available Democratic population into the three already heavily Democratic districts and dividing the remaining Democratic population amongst several otherwise Republican districts they hope to see the Congressional delegation change dramatically. From a current delegation of 6 Democrats and 5 Republicans the new redistricting plan intends to dump 3 Democrats, thus returning a delegation of 3 Democrats and 7 Republicans to Congress next year. (Indiana like New Jersey loses one seat next year.)

Republicans also saw a great opportunity in Washington State, where they dominate the apportionment process at all levels. Following closely on their tremendous "success" in Indiana, Republicans rammed a redistricting plan through the Legislature in April. The plan intended to change the Congressional delegation from 5 Democrats and 2 Republicans to perhaps only 3 Democrats and 5 Republicans. (Washington gains an additional seat.) Republican Governor Spellman vetoed the plan, however, as too extreme. The next effort will not be made until later this year.

In Colorado the Republicans who control both houses of the Legislature must contend with Democratic Governor Richard Lamm on redistricting. The Republicans have already passed and the Governor has vetoed two plans which are intended to shift the Congressional delegation from the current 3 Democrats and 2 Republicans to 1 Democrat and 5 Republicans. (Colorado gains a seat.) The Republicans have now countered with nearly a half million dollar TV advertising blitz aimed at discrediting Lamm as playing partisan politics -- in essence being politically unfair. Without going into great detail over what the Colorado Republicans have in mind you can see that the Democrats are up against heretofore unheard of tactics in the battleground of Congressional redistricting.

Against heavy odds, in the person of a popular and powerful President and the fundraising and organizational capability he represents, Democrats are wary of partisan politics. Democrats, even when successful are often on the defensive and appear open to just those media-hyped "fairness" arguments put forth in your work. The fact of the matter is that I feel very strongly that your Congressional redistricting plan is little more than an academic statement of your views of the desired outcome. Perhaps unwittingly, you play into Republican strategies quite well. Of course Republican spokesmen will deny any involvement or perhaps interest in your plan. But you can bet that in response to whatever Democrats propose, Republicans will be quick to embrace the "fair" Reock alternative. Political posturing of this nature is expected, but should be taken only for the rhetoric it represents.

Having said all this, I would like to add that in no way do I discourage input such as yours into a very complicated, sometimes unwieldy political process. In fact your expertise has been and I'm sure will continue to be of inordinate value to those of us in New Jersey government. It is a measure with which I take the seriousness of your work that such a lengthy response seems in order.

Once again I thank you for the time and effort you have given the issue of Congressional redistricting in New Jersey.

Sincerely,

Christopher J. Jackman,
SPEAKER

gm

cc: Honorable Brendan Byrne
Democratic Legislators
Democratic Congressmen