DAGGETT, George T., Plaintiff,

v.

KIMMELMAN, Irwin I., etc., et al., Defendants.

FORSYTHE, Edwin B., et al., Plaintiffs-Appellants and Cross-Appellees,

v.

KEAN, Thomas H., etc., et al., Defendants,

James J. Florio, et al., Defendants-Intervenors,

Carmen A. Orechio and Alan J. Karcher, Defendants-Intervenors-Appellees and Cross-Appellants.

Nos. 85–5648, 85–5668.

United States Court of Appeals, Third Circuit.

Argued July 31, 1986.

Decided Feb. 12, 1987.

As Amended Feb. 26, 1987.

Bernard Hellring (argued), Hellring, Lindeman, Goldstein, Siegal & Greenberg, Newark, N.J., for Forsythe, et al.

Leon J. Sokol (argued), William F. Dowd (argued), Greenstone & Sokol, Hackensack, N.J., for Orechio, et al.

Andrea M. Silkowitz (argued), Deputy Atty. Gen. of N.J., Trenton, N.J., for Kean, et al.

Before WEIS and HIGGINBOTHAM, Circuit Judges, and RE *, Chief Judge.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

■ This is an appeal and cross-appeal from a final judgment of the district court awarding attorneys' fees pursuant to 42 U.S.C. § 1988 (1982). The fee award in question follows a judicial determination, in litigation initiated by plaintiffs-appellants ("appellants"), who in 1982 were the seven Republican members of Congress from New Jersey and seven citizens who resided in the districts represented by those members, that the congressional reapportionment plan adopted in 1982 by the New Jersey legislature was unconstitutional. The district court awarded appellants attorneys' fees in the amount of $253,461, to be assessed against defendants-intervenors-appellees ("appellees"), who are New Jersey state legislators.[1] *Daggett v. Kimmelman*, 617 F.Supp. 1269 (D.N.J.1985).

Since we will affirm the holdings of the district court on the other issues appealed,[2] it is necessary to deal only with the award of counsel fees. Appellants, the congressional plaintiffs, assert error in the district court's refusal to award the full amount of fees requested. Appellees argue in their cross-appeal that the fee award should be substantially reduced as to every phase of the litigation and that the fees claimed for time expended in the so-called remedy phase should be disallowed. For the reasons noted below, we will affirm, with one exception, the district court's award of counsel fees for the so-called pre-remedy phase. Because it is unclear whether the *total* number of hours during the so-called remedy phase for which counsel were compensated involved solely "good-faith effort[s] to achieve population equality," *Karcher v. Daggett*, 462 U.S. 725, 727, 103 S.Ct. 2653, 2656, 77 L.Ed.2d 133 (1983), or whether some of the time billed was spent obtaining favorable political results for the appellants, we will remand for further findings on this issue.

## I. Facts and History

As a result of the 1980 decennial census, the New Jersey General Assembly was required to reduce, from 15 to 14, and thereby to reapportion, that state's federal congressional districts. Eventually, the legislature enacted Public Law 1982 c. 1 (the "Feldman Plan"), a reapportionment scheme that was signed into law by the Governor of New Jersey on January 19, 1982. Thereafter, individuals including the incumbent Republican members of Congress from New Jersey filed suit in federal court. These plaintiffs sought a declaration that the Feldman Plan violated article I, section 2 of the United States Constitu-

* The Honorable Edward D. Re, Chief Judge of the Court of International Trade, sitting by designation.

1. The three state defendants from the executive branch (the Governor of New Jersey, its Attorney General and its Secretary of State) initially advised this Court that they would not file a response brief in light of the fact that neither the appellants nor the appellees asserted positions in their original briefs adverse to these state defendants. In response to allegations raised for the first time in the appellants' reply brief, however, a reply brief was filed by these state defendants on the issue of their liability. By failing to raise this issue in their original briefs, appellants simply did not appeal the district court's conclusion that these state defend-

ants are not liable for counsel fees, and thus we do not consider this issue here. **Fed.R.App.P.** 28(a)(2) & 28(a)(4). *See also J.E.K. Indus., Inc. v. Shoemaker*, 763 F.2d 348, 351 (8th Cir.1985) ("[appellee's] failure to argue any alleged error in regard to the district court's dismissal of [appellee's] counterclaim must be considered as an abandonment of any claimed error in that regard").

2. In their cross-appeal, the state legislators raise the following issues: (1) legislative immunity; (2) the absence of the § 1983 action prerequisite to a § 1988 award; and (3) mootness. These contentions were considered thoroughly by the district court; we will affirm its holdings that these contentions lack merit.

tion,[3] the fourteenth amendment and 42 U.S.C. § 1983. Named as defendants were New Jersey Governor Kean, Attorney General Kimmelman, and Secretary of State Burgio. The 202d Session of the New Jersey General Assembly and the incumbent Democratic members of Congress from the State of New Jersey intervened in this suit to defend the constitutionality of the Feldman Plan.

After conducting a hearing, a three-judge district court, by a two-to-one vote, issued an opinion and order on March 3, 1982 declaring the Feldman Plan unconstitutional. *Daggett v. Kimmelman,* 535 F.Supp. 978 (D.N.J.1982). Its order enjoined the three state defendants from New Jersey's executive branch from conducting elections under the Feldman Plan. On application of the intervenors from the state legislature and from New Jersey's Democratic congressional delegation, however, Justice Brennan stayed the district court's order pending appeal to the Supreme Court. *Karcher v. Daggett,* 455 U.S. 1303, 102 S.Ct. 1298, 71 L.Ed.2d 635 (1982) (Brennan, Circuit Justice, in chambers). Appellants' motions to vacate this stay and to expedite the docketing of the state defendants' appeal from the district court order were denied, *Karcher v. Daggett,* 456 U.S. 901, 102 S.Ct. 1745, 72 L.Ed.2d 157 (1982), and probable jurisdiction was noted, *Karcher v. Daggett,* 457 U.S. 1131, 102 S.Ct. 2955, 73 L.Ed.2d 1347 (1982). The Supreme Court's affirmance of the district court's holding by a five-to-four vote restored the injunction. *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

When the New Jersey General Assembly subsequently failed to enact a constitutional congressional redistricting plan by February 3, 1984, the three-judge district court held a hearing on the question of further relief, and it unanimously adopted the redistricting plan submitted by appellants,

which achieved the lowest population deviation and most compact congressional districts. *Daggett v. Kimmelman,* 580 F.Supp. 1259 (D.N.J.1984). The intervenors then presented Justice Brennan with another stay application. He referred this application to the entire Court and, on March 30, 1984, by a six-to-three vote, the application was denied. *Karcher v. Daggett,* 466 U.S. 910, 104 S.Ct. 1691, 80 L.Ed.2d 165 (1984). A few days later the Court denied intervenors' motion to expedite consideration of their jurisdictional statement. *Karcher v. Daggett,* 466 U.S. 923, 104 S.Ct. 1703, 80 L.Ed.2d 177 (1984). Subsequently, on June 4, 1984, the Supreme Court summarily affirmed the three-judge district panel's adoption of the redistricting plan submitted by plaintiffs; three justices dissented from this order, voting to note probable jurisdiction and set the case for oral argument. *Karcher v. Daggett,* 467 U.S. 1222, 104 S.Ct. 2672, 81 L.Ed.2d 869 (1984) (mem.).

Pursuant to 42 U.S.C. § 1988 (1982), appellants on November 15, 1984, filed an application for an attorneys' fee award of nearly $600,000. The district court received extensive affidavits from all parties and heard oral argument on January 15, 1985 and July 30, 1985. The district court denied as moot the state defendants' motion to dismiss and considered the request for fees by appellants, the disclaimer of liability by appellees, and their challenge to the amount of fees requested. In determining the lodestar, the district court first reduced the number of hours billed by 10%. It then reduced the resulting, modified lodestar by an additional 20%. The district court also reduced Mr. Bernard Hellring's hourly rate from $300 to $250. While the original request was for $577,787.01, the final fee awarded by the district court was thus $253,461 (both figures include costs).

---

**3.** Article I, section 2 provides, in relevant part: The House of Representatives shall be composed of Members chosen every second Year by the People of the several States....

....

Representatives ... shall be apportioned among the several States which may be included within this Union, according to their respective Numbers....
**U.S. Const.** art. I, § 2.

## II. Pre-Remedy Phase Hours

We have carefully evaluated appellees' vigorous challenge to the appropriateness of the fee award. We find no fundamental flaws in the district court's fee award for counsel hours in the pre-remedy phase of this litigation.[4]

Of the 1,886.40 hours counsel spent throughout this litigation, 1,004.62 were in the pre-remedy phase. Appellants were successful in an intensely contested case that explored, and thus helped to map, some of the more uncertain boundaries of our constitutional law. On the merits of this litigation, the district court panel divided two judges to one, and the Supreme Court split five justices to four. The district court found that the appellants' total number of counsel hours, as billed, for the pre-remedy phase was justified. However, it reduced the 1,886.40 hourly total by 10 percent per attorney. It thus determined that 1,697.76 attorney hours were "reasonably expended" and therefore compensable under § 1988. The district court's reason for so lowering the hourly component of the lodestar that appellants sought was that a portion of the work performed was duplicative.

In a series of opinions we have explicitly stated our standards for approving counsel fees for prevailing parties. *See, e.g., In re Fine Paper Antitrust Litig.,* 751 F.2d 562 (3d Cir.1984); *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp,* 540 F.2d 102 (3d Cir.1976) (in banc) ("*Lindy II*"); *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973) ("*Lindy I*"). In particular, this Court has held that trial judges may not, in a perfunctory fashion, order blanket percentage reductions without thoroughly probing the record and noting their reasons with care and specificity. "If [a] court believes that a fee reduction in the lodestar is indicated, it must analyze the circumstance requiring the reduction and its relation to the fee, and it must make specific findings to support its action." *Prandini v. National Tea Co.,* 585 F.2d 47, 52 (3d Cir.1978) ("*Prandini II*"). *Accord Cunningham v. City of McKeesport,* 753 F.2d 262, 269 (3d Cir. 1985), *vacated and remanded,* — U.S. ——, 106 S.Ct. 3324, 92 L.Ed.2d 731, *reinstated,* 807 F.2d 49 (3d Cir.1986); *In re Fine Paper Antitrust Litig.,* 751 F.2d at 596. It is well-established in this Circuit that a district court needs to identify specifically the lodestar components. *See Prandini II,* 585 F.2d at 52. "[A]n unanalyzed allocation of hours will not be permissible in arriving at the lodestar." *Hughes v. Repko,* 578 F.2d 483, 487 (3d Cir.1978).

■ Although the question is a close one, we find that the district court provided adequate justification for the ten percent reduction in hours. It identified duplication in hours billed by the four attorneys for their work at four particular points in the pre-remedy phase: the drafting of the memorandum in opposition to the intervenors' first stay application to Justice Brennan, the 1982 argument before the three-judge panel, the 1983 argument before the Supreme Court, and the time spent preparing for that argument. *See Daggett,* 617 F.Supp. at 1281. In addition, the district court pointed to instances in the attorneys' Affidavit of Services where "three or four attorneys billed large numbers of hours for strategy and other conferences." *Id.* The district court thus found that

> the attorneys did not in every instance need to spend all of the hours each of them did on legal research, [that] three and four attorneys were not necessary in court, [that] not all of the time spent preparing for oral argument by all four attorneys was necessary, and [that] not every attorney should be compensated for time spent in conference.

*Id.*

In affirming the ten percent pro rata reduction in the hours requested, we conclude that the district court here made a

---

4. The "pre-remedy phase" is the time from the initiation of the litigation until the Supreme Court's affirmance in *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), of the three-judge panel's determination that the Feldman Plan was unconstitutional.

sufficiently specific "finding[ ] as to the number of hours of duplication" to support its across-the-board cut. *Prandini II*, 585 F.2d at 52. No court, viewing a record of this magnitude from the distance inherent in appellate review, could assess the reasonability of a reduction as slight as ten percent with flawless precision. In the circumstances of this complex and lengthy case, the record is adequate to support some slight reduction in the hours billed by counsel, and we are not confronted here with a court's "across the board [hour] cut [of 50% that] may have penalized both the efficient and inefficient alike." *In re Fine Paper Antitrust Litig.*, 751 F.2d at 594; *cf. Copeland v. Marshall*, 205 U.S.App. D.C. 390, 641 F.2d 880, 903 (D.C.Cir.1980) (en banc) (*"Copeland III"*) (refusing to fault district court for failing "to decide, for example, whether a particular motion could have been done in 9.6 hours instead of 14.3 hours"). We therefore conclude that this reduction was not an abuse of the district court's discretion.

### III. Pre-Remedy Phase Rates
#### A. Top-Heavy Staffing

■ Throughout this case, appellants employed only the most experienced lawyers, partners in the Newark law firm of Hellring, Lindeman, Goldstein, Siegal & Greenberg. The intervenors from New Jersey's 202d General Assembly, who are the appellees/cross-appellants in this case, challenge appellants' exclusive use of four partners (Messrs. Hellring, Goldstein, Raymar and Dreyfuss). Appellees assert that many matters in this litigation could have been handled by junior associates or paralegals, and that "reasonable" rates under § 1988 must therefore be lower than those billed. They assert that, according to the reasoning in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir.1983) ("A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."), if partners performed all tasks, including those normally handled by associates and paralegals, then they should not bill at their usual hourly rates.

Like the district court, appellees rely on the District of Columbia Circuit en banc opinion in *Copeland III* to urge lodestar reductions for inefficient use of partner time. *Copeland III*, however, is factually distinguishable from this case. The *Copeland III* litigation on the merits was a protracted gender discrimination suit against the government, and the district court there made specific findings as to the general expenditure of nonproductive hours by counsel for the plaintiff. *See* 205 U.S.App.D.C. at 412, 641 F.2d at 902. "Under the *special circumstances* of th[at] case," the D.C. Circuit found that the district court's across-the-board lodestar reduction, without a precise identification of the hours or types of work spent that were not compensable, "c[ould] not be condemned." *Id.* at 413, 641 F.2d at 903 (emphasis added). In addition, the "special circumstances" in *Copeland III* were "primarily ... the expenditure of unnecessary time by relatively *inexperienced* lawyers." *Id.* at 413, 641 F.2d at 903 (emphasis added); *see also id.* at 412–13, 641 F.2d at 902–03 ("hours that simply should not have been spent at all ... may occur, for example, when young associates' labors are inadequately organized by supervising partners"). Finally, we are not prepared to hold on this matter of great constitutional import that it was inappropriate to use only the most experienced litigators at the early stage of this case. With all due respect for the significant academic achievements of many recent law school graduates and neophytes at the bar, we recognize that it tends to be a significant distance from the theories spun in classrooms to the successes won in courtrooms. The insights obtained from years of experience in major litigation are often indispensable in making the most crucial, tactical judgments as to how a case should be framed and litigated. Counsel for the prevailing parties in *Copeland III*, for example, were criticized because that firm's partners left the vital stages of the litigation to their unsupervised or inadequately supervised junior as-

sociates.[5] In contrast to that litigation, the staffing of this case by counsel for appellants seems to have been more wise than top-heavy. This is not to say that we would not approve hour or fee reductions if the district court had specified in sufficient detail the tasks and the hours devoted to them that should have been performed by associates or paralegals. In the absence of such specific data, however, we cannot say on this record that the staffing of this case was top-heavy. We will therefore vacate the district court's twenty percent reduction in the lodestar amount awarded.

## B. Hourly Rates

Appellees also challenge the hourly rates approved by the district court. This Court measures the appropriate hourly rate for an attorney's services as that which has been historically charged in the community. *See Cunningham,* 753 F.2d at 268; *In re Fine Paper Antitrust Litig.,* 751 F.2d at 591. Confronted by challenges to the rates approved by the district court, we look for abuses of discretion in that court's determinations.

 The hourly rates approved were as follows: Mr. Goldstein, $200; Messrs. Dreyfuss and Raymar, $150. As to these amounts we can only say that, on the record of this case, they approach the highest limits that we could sanction upon review.[6] Though generous, however, approving such rates was no abuse of the district court's discretion.

 Appellants challenge the district court's reduction of Mr. Hellring's hourly rate from $300 to $250. While it may be appropriate for a lawyer of Mr. Hellring's standing at the bar—his competence and effectiveness as an advocate is acknowledged by all parties and by this Court—to charge his private clients $300.00 or more per hour, there nevertheless comes a point where a lawyer's historic rate, which private clients are willing to pay, cannot be imposed on his or her adversaries. *Cf. Black Grievance Comm. v. Philadelphia Elec. Co.,* 802 F.2d 648, 652 (3d Cir.) ("The reasonable value of an attorney's time ... is *generally* reflected in the attorney's normal billing rate.") (emphasis added), *petition for cert. filed,* 55 U.S.L.W. 3437 (U.S. Dec. 2, 1986) (No. 86–905). As the Sixth Circuit noted recently, § 1988 "use[s] the words 'reasonable' fees, not 'liberal' fees. Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region." *Coulter v. Tennessee,* 805 F.2d 146, 149 (6th Cir.1986). *See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* — U.S. —, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (fee-shifting "statutes were not ... intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his [or her] client"); *Evans v. Jeff D.,* — U.S. —, 106 S.Ct. 1531, 1551, 89 L.Ed.2d 747 (1986) (Brennan, J., joined by Marshall and Blackmun, JJ., dissenting) ("there is a *range* of 'reasonable attorney's fees' consistent with the Fees Act in any given case") (original emphasis); *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984) (in determining fee reasonableness under § 1988, "the rates charged in private representations may afford relevant comparisons"). If we were confronted with a case where a litigator of national repute charged $1,000 per hour in the legal mar-

---

**5.** In a footnote, the *Copeland III* court noted that "[t]he District Court believed that *inadequate partner time* had been spent in th[e] case. This seems indeed to have been the case. We do not, of course, intend to discourage the use of associates in litigation of this sort.... *However, young associates' efforts will be fully productive only if guided by proper supervision by experienced litigators.*" 250 U.S.App.D.C. at 413 n. 50, 641 F.2d at 903 n. 50 (emphases added); *cf. Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984) ("There may

be cases ... where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue.").

**6.** In other words, we do not believe that there would have been an abuse of the district court's discretion if a somewhat smaller amount had been approved for each counsel.

ketplace and nevertheless had innumerable clients waiting at his or her door to pay such rates, that extraordinary level of remuneration could not be legally imposed as a matter of course on an adversary in a prevailing party's counsel fee case. Mr. Hellring established that, at the time of this litigation, his historic hourly rate was $300, and that he had received judicial approval for an hourly fee of $375 as court-appointed counsel in a case where there was an existing trust fund. While we recognize that "[a]ttorneys are not fungible," *Black Grievance Comm.*, 802 F.2d at 652, and note Mr. Hellring's disappointment in this diminution of his fee request, as we read the cases he has not established a clear legal entitlement to $300 per hour.[7] We therefore approve the reduction of his fee as a matter of judicial discretion.

## IV. Remedy Phase

According to the affidavits, the total number of attorney hours in the remedy phase[8] was 773.28, resulting in a fee request of $178,635.00. Of this time, 297.98 hours were spent in conferences with clients and congressmen.[9] The approximately 300 hours spent conferring with clients in this phase compares with 143.67 hours spent in the various aspects of the pre-remedy phase (45.1 in the initial challenge to the Feldman Plan; 88.57 during the first Supreme Court review). No billed hours were spent conferring with clients regarding the second Supreme Court review or the fee application.

■ Appellees take two positions on their liability for the remedy phase. They first assert that appellants are not entitled to *any* compensation for the remedy phase. However, to accept this assertion requires one first to disregard Chief Justice Marshall's admonition that where there is a right there must be a remedy. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 146, 163, 2 L.Ed. 60 (1803). If the appellees had submitted a reapportionment plan that had been adopted by the district court, their argument might be plausible, for under such circumstances the appellants would not be the "prevailing party" on the remedy issue. The appellees' plan was rejected by the district court, however, so they certainly did not prevail. Appellants, by contrast, did prevail, at least in part, which is all that § 1988 requires.[10]

---

**7.** To offer one example that seemed to persuade the district court, Professor Laurence Tribe of Harvard Law School is one of today's most effective advocates before the United States Supreme Court. Despite this established reputation and his particular success in vindicating one of the core protections of the first amendment, however, *see Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982); *but see Evans v. Jeff D.,* — U.S. —, 106 S.Ct. 1531, 1541 n. 25, 89 L.Ed.2d 747 (1986) (characterizing, perhaps a bit harshly, *Grendel's Den* as merely a "successful challenge to [a] law zoning liquor establishments"), his § 1988 fee request of $275 per hour was reduced to $175 by the First Circuit. *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 956 (1st Cir.1984). As a matter of law, we see no reason why Mr. Hellring is entitled to more favorable treatment here than Professor Tribe was in the *Grendel's Den* litigation. Indeed, on balance, the record suggests that the district court was far more generous to Mr. Hellring than the First Circuit was to Professor Tribe.

**8.** The remedy phase of this litigation began when the Supreme Court decided that the Feldman Plan was unconstitutional and continued

through the district court's acceptance of appellants' proposed redistricting plan.

**9.** These figures are taken from the unopposed affidavit of New Jersey Deputy Attorney General William Harla, who analyzed and recategorized appellants' fee submissions into the phases we refer to here. *See* Jt.App. at 1054a–55a. Mr. Harla represented the state defendants in the attorney fee application.

**10.** *See, e.g., Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Maher v. Gagne,* 448 U.S. 122, 130, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980) ("gain[ing] sufficient relief" makes one a § 1988 "prevailing party"); *Ashley v. Atlantic Richfield Co.,* 794 F.2d 128, 131 (3d Cir.1986); *Uviedo v. Steves Sash & Door Co.,* 760 F.2d 87, 88 (5th Cir.1985) (Rubin, J., joined by Politz, Randall, Tate, Johnson and Williams, JJ., dissenting from denial of rehearing en banc) ("[s]uccess on any significant issue now suffices [to make one a § 1988 prevailing party] in eleven circuits"), *cert. denied,* — U.S. —, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); Institutionalized *Juveniles v. Secretary of Pub. Welfare,* 758 F.2d 897, 910–12 (3d Cir.1985); *Abraham v. Pekarski,* 728 F.2d

In the few reported decisions that have considered whether a § 1988 "prevailing party" is entitled to an attorney's fee award for work performed in the remedy phase of redistricting litigation, fees have been awarded. *See In re Kansas Congressional Dists. Reapportionment Cases,* 745 F.2d 610 (10th Cir.1984); *Ramos v. Koebig,* 638 F.2d 838, 845–46 (5th Cir. Unit A 1981); *Connor v. Winter,* 519 F.Supp. 1337 (S.D. Miss.1981) (three-judge court). We will not, therefore, as a matter of law preclude recovery for the remedy phase of the proceedings.

■ Secondly, appellees contest the award of fees for hours which may have been spent solely in partisan negotiations and proceedings. As Justice Frankfurter once noted, "there comes a point where [we] should not be ignorant as judges of what we know as [women and] men." *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (Frankfurter, J., joined by Murphy and Rutledge, JJ.): *cf. In re Fine Paper Antitrust Litig.,* 751 F.2d at 584 ("we do not approach the review process with any predisposition against what we know"). Here, we cannot be oblivious to the fact that there are extraordinary political machinations and implications in the process of drawing congressional district boundaries. The Republican congressional appellants, to put the matter precisely, certainly were not interested in this statutory revision simply because of their innate attachment to mathematical exactitude. Indeed, it is certain

that they would have tolerated any less exact redistricting plan that would have furthered their partisan prospects for reelection. We simply cannot discern, in the district court's opinion, how many attorney hours in the remedy phase were spent obtaining mathematical exactitude and how many hours were devoted solely to obtaining the most favorable political result for the appellants. While nothing in the record suggests that the appellants have acted in bad faith in making this fee request, we do find that the record is inadequate to justify the district court's order compensating 773.28 hours of work (i.e., an award of $178,635) in the remedy phase.

Because of the magnitude of the amount sought and the possibility of confusing a lawyer's role in getting a mathematically equitable distribution with a client's preference for maximizing his or her political advantages, the complex record of this case requires closer inquiry into the nature of the services rendered and the time spent. In addition, we are mindful of the fact that it is the appellants' burden to demonstrate the reasonable necessity of the hours charged. *See, e.g., Hughes,* 578 F.2d at 487. Appellees are not obligated to compensate counsel's efforts merely to maximize anyone's political leverage. *But cf. In re Kansas Congressional Dists. Reapportionment Cases,* 745 F.2d at 613 ("the fact that some of the issues raised by the plaintiffs were political rather than constitutional does not alter the [§ 1988 fee] award").

167, 175 (3d Cir.), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *Commissioners Court of Medina County, Tex. v. United States,* 231 U.S.App.D.C. 260, 719 F.2d 1179, 1182 (D.C.Cir.1983) (per curiam) (if appellants show on remand "that their participation ... was a substantial factor in the County's decision to terminate its attempt to gain, through litigation, preclearance for [its redistricting] plans ..., there can be no tenable argument ... that they failed to prevail"); *Commissioners Court of Medina County, Tex. v. United States,* 221 U.S. App.D.C. 116, 683 F.2d 435, 441 (D.C.Cir.1982) ("[T]he County's argument that [the intervenors] should not be awarded fees because [their] proposed [redistricting] plan was not adopted must fail. Fee claimants under the Act need not show ... that their proposed plan was adopted

in order to be found 'prevailing parties.'"); *Ramos v. Koebig,* 638 F.2d 838, 845 (5th Cir. Unit A 1981) ("[T]hat the district court rejected plaintiffs' [reapportionment] plan, and adopted the [City] Council's plan ... is irrelevant. A [§ 1988] prevailing party need not have prevailed on all issues; it is sufficient that plaintiffs prevail on the main issue."); *cf. Posada v. Lamb County, Tex.,* 716 F.2d 1066, 1076 (5th Cir.1983) (because court "c[ould] not say with certainty that the County would have defaulted yet again [on its obligation to adopt and implement a legally valid apportionment plan for county commissioner and justice of the peace precincts] had the plaintiffs not intervened," the district court was not clearly erroneous in denying plaintiffs' § 1988 fee request).

We will therefore remand for further findings on this issue.

### V. Conclusion

For the foregoing reasons, the judgment of the district court in regard to the pre-remedy phase hours will be affirmed, the hourly rates will be affirmed and applied to the lodestar without the twenty percent reduction, and the remedy phase determinations will be remanded for proceedings consistent with this opinion.