**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2962
_____

KENDRICK LANGLEY,
Appellant

v.

UNITED PARCEL SERVICE, INC.; SHAWN MCNEIL;
ORLANDO RUIZ; CHARLES PENA;
JOHN DOES 1-5; XYZ CORPS. 1-10
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. Action No. 2-18-cv-08807)
District Judge: Honorable Madeline C. Arleo
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 21, 2022
_____

Before: GREENAWAY, JR., MATEY and ROTH, *Circuit Judges*.

(Opinion Filed: February 1, 2023)

_____

OPINION[*]

_____

**GREENAWAY, JR**., *Circuit Judge*.

This suit arises from Plaintiff-Appellant Kendrick Langley's (Appellant or Langley) termination from the United Parcel Service, Inc. (UPS). Langley alleges that he was terminated because of his race and seeks relief under the New Jersey Law Against Discrimination (NJLAD) (N.J. Stat. Ann. § 10:5-12(a)). The United States District Court for the District of New Jersey granted summary judgment for UPS. Because there is no genuine dispute of material fact, we will affirm the District Court's judgment.

**I.     FACTS AND PROCEDURAL HISTORY**

Langley, an African American male, began working at UPS in 1995. In 2009, he became an On Road Supervisor and held this position until his termination in 2015. This was a safety-sensitive position, meaning it required him to ensure UPS drivers were operating vehicles safely. Langley was terminated because he tested positive for cocaine

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

under UPS's random drug policy for employees in "safety-sensitive" positions. App. J-77–79.

Shawn McNeil, Langley's direct supervisor, allegedly told Langley that Ray Barczak, UPS's Director of Transportation, "has racist tendencies." App. D-27. Barczak purportedly made racist comments about African Americans. Although McNeil denies that he told Langley about Barczak's racist comments, it is the lynchpin of Langley's argument.

### A.     Drug and Alcohol Testing Policies

At the time of the incident and at present, UPS has had two drug testing policies in place. The first is a random drug test pursuant to the Department of Transportation (DOT) regulation for commercial drives. All employees who hold positions impacting safety are covered employees under this testing protocol. The employees' identification numbers or social security numbers are inputted into a computerized program and randomly selected throughout the year to be tested. The test consists of a urine screen that is administered in a lab certified by the Department of Health and Human Services. The urine sample is split into two specimens and then shipped to a testing lab. If the primary specimen tests positive for a drug, then another test is performed to confirm that first test.

A Medical Review Officer (MRO) receives the test results and then informs employees about a positive or invalid test result. It is up to the MRO to determine whether a positive test result arose from routine medicine intake by an employee. An

3

employee can request that the MRO send the split sample to another certified lab for further testing.  An MRO must review the confirmation test and determine with finality whether an employee has tested positive.  Such an employee is removed from performing their duties and must also be disciplined.  The employee can also be referred to a substance abuse program: SAP.  The second relevant type of procedure is for reasonable suspicion drug or alcohol testing.  The DOT, and thus UPS, require this type of testing "whenever a manager . . . ha[d] reason to believe that a covered employee's appearance or behavior may indicate the use of drugs or alcohol."  App.  J-81.

There are a series of steps a supervisor must take before requiring an employee to test.  First, the manager who suspects an employee was under the influence of drugs or alcohol must have been trained on alcohol misuse and controlled substance use.  Second, the manager must make "specific contemporaneous, articulable and documentable observations concerning the appearance, behavior, speech, or unusual characteristics of the employee."  App. J-81.  Third, two persons in management must observe an employee and provide written notice to the employee of what was observed.  The behavior must have been observed immediately preceding, during, or right after the

4

workday.  Only then will UPS require an employee to submit to "a fitness-for-duty medical evaluation, which may include drug and alcohol testing."  App.  at J-82.

### B.    Langley's Random Drug Test

Langley submitted to a random drug test on January 29, 2015, the resulting specimen tested positive for cocaine.  Langley denied using cocaine then, and still remains adamant in his denial.  On February 6, 2015, an MRO notified Langley of this result.  After a series of back and forth among the UPS Division Manager, Chuck Pena, McNeil, and the human resources manager, Orlando Ruiz, Langley was ultimately instructed to enter a substance abuse program (SAP) or he would face termination. Langley informed Ruiz and McNeil that he is usually on blood pressure medications, but he did not remember whether he was taking that or any other medication immediately before the drug test.

On February 6, 2015, Langley met with Ruiz and McNeil.  They relayed that Langley could not work until the results of his second specimen were available and an investigation was complete.  Langley again denied using drugs.  Langley also learned that if he enrolled in a SAP and complied with testing for an extended period, he could have been allowed to leave the program and return to work.  There was no decision made on this date on whether UPS would terminate Langley.

Langley's second specimen tested positive for cocaine, and he undertook various efforts to prove both tests wrong.  Langley voluntarily underwent a polygraph test.  The results showed that Langley truthfully denied using cocaine.  Langley also voluntarily

5

underwent another examination by his physician, Dr. John Penek.  Dr. Penek concluded that within a "reasonable degree of medical certainty," Langley had received a false positive cocaine test.  Although Langley did not want to participate in the SAP program at first, he eventually completed the three-hour program.

Ultimately, a UPS District Human Resources Manager entered the picture:  Glenn Henry.  He was tasked with deciding whether UPS should terminate Langley.  On February 17, 2015, Henry determined that Langley would be terminated because his random drug test had come back positive.

On March 9, 2015, Ruiz and Pena met with Langley for a termination meeting.  Pena offered Langley the opportunity to resign but Langley refused.  He was terminated, and it was Henry who made the decision to do so.

### C.  The Employee Dispute Resolution (EDR) Process and the Last Chance Agreement (LCA)

After his termination, Langley participated in UPS's EDR process.  Langley was encouraged to participate in the EDR process post-termination as a means of challenging the termination itself.  He was given this option post-termination because his management team felt positive about Langley's performance as an employee.  The first step was the "open door process."[1]  *Id.*  at D-25.  He met with Henry as a part of this process and never brought up race.  Henry offered reinstatement to Langley's former

---

[1] The "open door process" encourages an employee to resolve their dispute informally by bringing a complaint to their supervisor or manager.  S.A.23.

position as On Road Supervisor in exchange for signing the LCA. This agreement settled all disputes between Langley and UPS, including but not limited to Langley's termination. The LCA outlined what Langley would receive in return if he agreed to release all future legal claims against UPS. Langley was offered his same supervisory position with the same pay and benefits including restricted stock units, but no back-pay. Langley declined to sign the LCA and permanently separated from UPS.

### D. Comparators Shawn McNeil and Phil Venello

To support his wrongful termination claim, Langley argues that his direct supervisor McNeil is a valid comparator. McNeil was convicted for driving under the influence outside of work hours. McNeil himself reported the DWI to UPS. UPS did not take any formal action but disallowed him from participating in any safety rides. McNeil was never subject to any testing at UPS because of his DWI, whether it be random or the reasonable suspicion drug testing.

To rebut, UPS provides what it argues are appropriate comparators. First, a similarly situated Caucasian employee who was treated the same as Langley, Phil Venello. Venello was terminated from UPS around the same time as Langley. He held the same position of On Road Supervisor and was found to be using marijuana while at work. He was arrested for marijuana during off-work hours but tested positive after a

7

reasonable suspicion test. He participated in the EDR process after termination. He signed an LCA and retained his position at UPS.

Two other Caucasian employees were terminated for possessing drugs and being under the influence of alcohol. Christian Buitrago was terminated after possessing marijuana as he was leaving a UPS facility, and Greg Devaney was terminated for abusing alcohol while working.

### E. Procedural History

Langley commenced this action in the Superior Court of New Jersey. Among other things, he claimed that UPS violated the NJLAD. After two removals to the District of New Jersey and dismissal of various parties and claims, the Parties proceeded to discovery. UPS moved for summary judgment, arguing that Langley had failed to establish a prima facie wrongful termination claim and that Langley's termination was voluntary, considering his rejection of the LCA.[2] The District Court granted summary judgment for UPS. This timely appeal followed.

## II. JURISDICTION[3] AND STANDARD OF REVIEW

The District Court had jurisdiction over this matter under 28 U.S.C. § 1332(a). "We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's grant of

---

[2] Because the District Court held that Langley did not make a prima facie claim of wrongful termination, it did not reach the second issue of whether Langley's termination was an "adverse action."

[3] Both Parties incorrectly cite 28 U.S.C. § 1295(a)(1) as the authority for our jurisdiction. That statute articulates the jurisdictional rules relevant to the United States

8

summary judgment." *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 95 n.7 (3d Cir. 2009).

Our review is plenary, and we apply the same standard as the District Court. *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). Under that standard, summary judgment is appropriate only if, construed in the light most favorable to the non-moving party, the record shows that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. *See Wharton v. Danberg*, 854 F.3d 234, 241 (3d Cir. 2017); Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the suit under the governing law. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). We must review the record and draw all inferences in favor of the non-moving party when determining whether there is a dispute of material fact. *Shelton v. Bledsoe*, 775 F.3d 554, 559 (3d Cir. 2015).

## III. ANALYSIS

Langley appeals the District Court's grant of summary judgment for Defendant on his NJLAD wrongful termination claim. He raises two issues. First, Langley argues that the District Court erred in holding that he had failed to make a prima facie race discrimination claim because he had failed to put forth a valid comparator. Second, Langley argues that the District Court erred in finding that he had failed to provide

---

Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295. We have jurisdiction under 28 U.S.C. § 1291.

sufficient evidence to show an inference of intentional discrimination (the fourth element required for a prima facie race discrimination claim). Because Langley cannot show that there is a genuine dispute of material fact to be resolved at trial, we will affirm the District Court's decision.

NJLAD makes it unlawful for an employer to discharge an employee on the basis of race. N.J. Stat. Ann. § 10:5-12(a). Discrimination claims brought under NJLAD are subject to the *McDonnell Douglas* burden-shifting framework. *Grigoletti v. Ortho Pharm. Corp.*, 570 A.2d 903, 906–07 (N.J. 1990); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff must establish that "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to . . . retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Once a plaintiff meets the initial burden of making out a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate legitimate, nondiscriminatory reasons for the employment decision. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Finally, the burden of production shifts back to the plaintiff, who must show through direct or circumstantial evidence that the legitimate, nondiscriminatory reason given is merely pretext and the protected status

of the plaintiff was the determinative factor of the adverse employment action. *See Makky*, 541 F.3d at 214–20.

The only element at issue[4] is whether Langley presented sufficient evidence to support an inference of race discrimination. The District Court held that Langley had not provided evidence that would allow a reasonable factfinder to conclude that there was an inference of intentional discrimination. McNeil was not a valid comparator because he was unlike Langley in all relevant respects. UPS presented evidence of similarly situated Caucasian comparators who were treated the same as Langley, showing that UPS applied its drug testing policy in a race-neutral way. We agree.

A plaintiff can show an inference of intentional discrimination by identifying a similarly situated individual outside the protected class, who engaged in the same conduct as a plaintiff but was treated more favorably. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). We look at several factors when determining whether a person qualifies as similarly situated. *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296,

---

[4] Langley raises a new theory of recovery in his Reply in arguing that the totality of the circumstances illustrates his race was one motivating factor for his termination, even if other legitimate reasons existed. Because this theory was never raised in his opening brief or below in the District Court, we consider this argument forfeited. *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 146–47 (3d Cir. 2017) ("Forfeiture is the failure to make the timely assertion of a right, an example of which is an inadvertent failure to raise an argument.") (cleaned up); *Daggett v. Kimmelman*, 811 F.2d 793, 795 n.1 (3d Cir. 1987) (not considering an issue appellants failed to raise in their original briefs (citing Fed. R. App. P. 28(a)(2) and 28(a)(4)). We decline to reach the merits of this claim.

305 (3d Cir. 2004). "[W]e must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Id.* This inquiry is fact-intensive and must be done on a "case-by-case basis rather than a mechanistic and inflexible manner." *Id.*

McNeil is not a valid comparator because he is not similarly situated. Contrary to what Appellant suggests, McNeil and Langley had different job functions and a different level of supervisory responsibility. McNeil was an On Road Manager. He managed the performance of all UPS drivers and ensured they complied with safety protocols. But Langley was a subordinate as an On Road Supervisor. He took part in safety rides with UPS drivers and observed the employees day to day. Moreover, operating motor vehicles was not a part of McNeil's core responsibility. Although both positions involve driving to some degree, these differences in responsibility suggest that they were not similarly situated. *See Mandel*, 706 F.3d at 170; *Monaco*, 359 F.3d at 305–06 (refusing to treat vice presidents and branch managers as similarly situated even where they had some identical responsibilities).

Appellant's argument that McNeil should have been drug tested under the reasonable suspicion drug testing policy disregards UPS policy. Even if McNeil's DWI conviction implicated his duties at UPS, he could not be tested for alcohol abuse. The policy requires that a manager must suspect an employee is under the influence of alcohol at work to initiate this process. No manager at UPS observed McNeil under the influence

12

of alcohol at work.[5]  Nothing in either of UPS's substance testing policies allows for testing of employees based on these convictions that occurred outside of work.  This DWI differs from Langley's failure of a random drug test on a day he was at work during work hours.

Appellant's position that we should treat his random drug test result and McNeil's non-work-related DWI of "comparable seriousness" is not supported in this Circuit.  Langley relies on an out-of-circuit decision, *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).  The Sixth Circuit merely allows an employer to "more severe[ly]" treat employees involved in "more egregious circumstances."  *Clayton*, 281 F.3d at 612.  The record proves that—according to UPS policy—the on-duty random drug test versus off-duty DWI was not of "comparable seriousness" as Appellant suggests.[6]

Undisputed evidence by UPS disproves Langley's claim that he was treated unfairly.  No one in management had previously been terminated under the random drug testing policy, so the only valid comparators presented were all Caucasian and terminated under the reasonable drug testing policy.  Butriago was terminated after possessing

_____

[5] This is why none of Appellant's arguments about McNeil's responsibility of overseeing UPS drivers and being suspended for three months from driving matter. Langley's argument boils down to the fact that McNeil should have been drug tested under the reasonable drug testing policy and potentially terminated if there was no racially motivated termination.  Nothing in the UPS policy mandates or even allows for such testing.  After being convicted of the DWI, McNeil was not observed to be impaired or in any other manner that would suggest abuse of alcohol while he was working.

[6] To be sure, DOT regulations prohibited UPS from testing McNeil under the reasonable suspicion policy.  *See* 49 C.F.R. § 382.307(a).

13

marijuana as he was leaving UPS. Devaney was terminated for being intoxicated while at work. Importantly, Venello held the same position of On Road Supervisor and was terminated after it was discovered that he was using marijuana at work. The key difference between Langley and Venello is that Venello signed the LCA after participating in the EDR process, and thus remains employed by UPS.

Lastly, any potentially racist statements made by Barczak are irrelevant. The District Court correctly found, and Appellant does not challenge, that Barczak's potentially problematic views cannot prove an inference of intentional discrimination. Henry, not Barczak, made the final decision to terminate Langley. Barczak's statements are disconnected from Langley's termination because we do not know how much time had passed since Barczak made these statements. These "[s]tray remarks" were made by a decision-maker "unrelated to the decision process" and should not be given "great weight."[7] *Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)).

## IV.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's decision to grant summary judgment in favor of Defendant on all of Langley's claims under NJLAD.

---

[7] Even assuming *arguendo* that Langley had satisfied the prerequisites of a prima facie case, there is not sufficient evidence to establish pretext. We address this solely because Langley presses the issue. Pretext would still fail because Langley has not produced evidence to refute UPS's justification for why he was terminated. Langley's argumentation, as supported by evidence in the record, amounts to no more than his

"personal view of his employer's explanation and falls far short of establishing pretext." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003).